Suzanne Novak*
Jordan Goldberg*
Center for Reproductive Rights
120 Wall Street, 14th Floor
New York, New York 10005
snovak@reprorights.org
jgoldberg@reprorights.org
Tel: (917) 637-3600

Aimee H. Goldstein**
James G. Gamble**
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
agoldstein@stblaw.com
jgamble@stblaw.com
Tel:  (212) 455-2000

Christopher A. LaVoy (016609)
LaVoy & Chernoff, PC
201 North Central Avenue, Suite 3300
Phoenix, Arizona 85004
cal@lavoychernoff.com
Tel:  (602) 253-3330

Attorneys for plaintiffs

*Application for admission *pro hac vice* filed
**Application for admission p*ro hac vice* forthcoming

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Tucson Women's Center; Family Planning Associates; William Richardson, M.D.; Paul A. Isaacson, M.D.; and Frank Laudonio, M.D., | Case No. |
| Plaintiffs, | **COMPLAINT** |
| vs. | |
| Arizona Medical Board;  Lisa Wynn, in her official capacity as Executive Director of the Arizona Medical Board; and Terry Goddard, in his official capacity as Attorney General of Arizona, | |
| Defendants. | |

1.      Plaintiffs, by and through their undersigned attorneys, bring this complaint against the above-named defendants, their employees, agents, and successors in office, and in support thereof allege the following:

**I.      PRELIMINARY STATEMENT**

2.      This is a facial and as-applied pre-enforcement action under 42 U.S.C. § 1983 and the United States Constitution challenging certain provisions of recently enacted  Arizona House Bill  2564, which imposes unconstitutional restrictions on abortion  and other reproductive health care providers and their patients.  Arizona Revised Statutes §§ 36-2153, 36-2154, as revised by Arizona House Bill 2564 (hereinafter "the Act" or "HB 2564").   These sections of the Act: require any woman who seeks an abortion in Arizona to travel to the facility at least twice, at least twenty-four hours apart, and to receive state-mandated counseling at the first visit, except in cases of medical emergency; prohibit physicians or any healthcare providers from charging for any services provided to a patient who has inquired about an abortion until after she has followed the new informed consent process; and amend and enact two "conscience clauses" that permit any healthcare worker to refuse to "facilitate or participate in" the provision of medical care including abortions or emergency contraception.  (A Copy of the Act is annexed hereto as Exhibit A.)

3.      Prior to the enactment of HB 2564, abortion providers in Arizona, like all other healthcare providers in the state, were already required by both state law and medical ethics to obtain the informed consent of their patients prior to the performance of any medical procedure.  Prior to passage of HB 2564, the contents of the informed consent process for abortion procedures was, as for all other medical procedures, governed by the prevailing standard of care and tort liability.  Under the Act, "informed consent" for abortion has been statutorily defined; pursuant to the Act, such consent cannot be given until a patient seeking an abortion has received state-mandated

information in-person from a physician, waited 24 hours, and then returned for a second visit to undergo the abortion.  The Act's requirements may be waived only in the event of a narrowly defined "medical emergency," even in circumstances where compliance with the Act is medically inappropriate.

4.     The Act also prohibits a physician from charging a patient for *any* medical services the physician provides to her on a day that the patient inquires about an abortion. Should a patient make such an inquiry about abortion services, the physician must wait until after the state-mandated counseling for abortion has been provided and the twenty-four hour waiting period expires, before the physician may request payment for the previously-provided services.

5.     Violation of the Act's informed consent mandates or payment limitation constitutes unprofessional conduct and subjects the physician to possible license revocation or suspension.

6.     Absent injunctive relief from this Court, the Act becomes effective on September 30, 2009.

7.     HB 2564 will have the effect of placing substantial obstacles in the path of women seeking abortions in Arizona.  Specifically, it will: prevent some women from obtaining abortions altogether; cause other women to delay their abortions until later in pregnancy, when the procedure is more dangerous; will cause, or increase the risk of, psychological harm to women who seek abortions; unnecessarily increase medical risks and the risks of abuse for women who seek abortions; cause, or increase the risk of, involuntary disclosure of women's abortions; and pressure and intimidate pregnant women into continued pregnancy and childbirth.

8.     The amended statutes also contains provisions that:  (a) fail to give Plaintiffs adequate notice of how to conform their conduct to the requirements of the law and subject Plaintiffs to the risk of arbitrary enforcement in violation of Plaintiffs' right

to due process; (b) are irrational, have no legitimate purpose and discriminate against abortion providers in violation of the Equal Protection Clause; and/or (c) will result in an unconstitutional government taking of physicians' and other healthcare providers' property that is not for a public use and is without just compensation.

9.    Plaintiffs seek both declaratory and injunctive relief on the grounds that Arizona House Bill 2564 violate rights guaranteed by the U.S. Constitution, including the right to privacy; the right to liberty; the right of bodily integrity; the right to equal protection; and the right to due process, all as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. § 1983.

10.    Plaintiffs also seek preliminary relief against enforcement of the regulatory scheme in order to maintain the status quo and prevent irreparable harm to their patients and themselves pending resolution of their constitutional claims.

## II.    JURISDICTION AND VENUE

11.    This court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and the Fifth and Fourteenth Amendments to the United States Constitution.

12.    Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202 and by Rules 57 and 65 of the Federal Rules of Civil Procedure.

13.    Venue in this court is proper under 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to this action occurred in this district and defendants are located in this district.

## III.    PARTIES

### A.    Plaintiffs

14.    Plaintiff Tucson Woman's Center (hereinafter "TWC") is a reproductive health care facility in Tucson.  TWC offers a variety of reproductive health care services, including abortions up to 16 weeks of pregnancy as measured from the first day of the

woman's last menstrual period (hereinafter "lmp"); contraceptive services; pregnancy testing; non-directive options counseling; referrals for appropriate health services at other facilities; and post-operative examinations.  TWC sues on its own behalf and on behalf of its patients seeking abortions.

15.     TWC is the private medical practice of Plaintiff William Richardson, M.D., who is a physician licensed to practice medicine in the State of Arizona.  Dr. Richardson provides a variety of gynecological services at  TWC including abortions up to 16 weeks lmp; contraceptive services; pregnancy testing; referrals for appropriate health services at other facilities; and post-operative examinations.  Dr. Richardson sues on his own behalf and on behalf of his patients seeking abortions.

16.     Plaintiff Family Planning Associates (hereinafter "FPA) is a reproductive health care facility in Phoenix.  It provides a range of reproductive health care services, including abortions through twenty-two weeks lmp, general gynecological services, well-woman exams, and STD testing.  FPA sues on its own behalf and on behalf of its patients seeking abortions.

17.     Plaintiff Paul Isaacson, M.D., is one of the owners of the private medical practice FPA.  He is a physician licensed to practice medicine in the states of Arizona and Nevada and is certified by the American board of obstetrics and gynecology.  Dr. Isaacson provides a wide range of reproductive health care services at FPA, including abortion through twenty-two weeks lmp, general gynecological services, well-woman exams, and STD testing.  Dr. Isaacson sues on his own behalf and on behalf of his patients seeking abortions.

18.     Plaintiff Frank Laudonio, M.D. is a physician licensed to practice medicine in the state of Arizona and is board certified in obstetrics and gynecology.  Dr. Laudonio provides prenatal care and delivery for women carrying their pregnancies to term and

provides general gynecological services.  He does not provide abortions, but provides referrals for abortions.  Dr. Laudonio sues on his own behalf.

**B.    Defendants**

19.    Defendant Arizona Medical Board is the entity responsible for enforcing disciplinary sanctions against physicians who violate the informed consent provisions of HB 2564.  *See* Ariz. Rev. Stat. Ann. § 32-1403; Ariz. Rev. Stat. Ann. § 32-1451.  HB 2564 specifies that violations of the informed consent provisions, including any failure to properly give the state-mandated counseling information, to wait the required twenty-four hours or to attempt to bill a patient prior to the expiration of that "reflection period," is unprofessional conduct and shall be disciplined with either the suspension or revocation of the physician's license "pursuant to title 32, chapter 13 or 17."  These chapters of the Arizona Revised Statutes Annotated are enforced by the Arizona Medical Board, which possess the authority to investigate and discipline physicians for violations of professional norms.  In addition to the sanctions mentioned in HB 2564, the Arizona Medical Board is also empowered to impose other sanctions upon physicians found to have engaged in unprofessional conduct, including fines between $1000 and $10,000 for each violation of the statute, plus the costs of any formal hearings.  Ariz. Rev. Stat. Ann. § 32-1451.

20.    Defendant Lisa Wynn is the Executive Director of the Arizona Medical Board.  The Board may delegate much of its disciplinary authority to the Executive Director.  *See* Ariz. Rev. Stat. Ann. § 32-1405.  Ms. Wynn is sued in her official capacity.

21.    Defendant Terry Goddard is the Attorney General of Arizona.  The Attorney General provides the Arizona Medical Board with legal counsel, including providing assistance to the Board to interpret its obligations and enforcement responsibilities under new legislation.  *See* Ariz. Rev. Stat. Ann.  § 41-192.  The Attorney General also represents the Board as its legal counsel and defends its decisions to revoke

or suspend physicians' licenses in appeals before the state courts.  *Id.*; *see also* Ariz. Rev. Stat. Ann. § 41-193.  He is sued in his official capacity.

**IV.    STATUTORY FRAMEWORK**

22.    The Act amends Title 36, Chapter 20 of the Arizona Revised Statutes Annotated to add new provisions and amend existing provisions, governing the provision of abortion.

23.    The Act prohibits a physician from providing an abortion unless, at least 24 hours prior to the abortion procedure, the patient receives certain state-mandated information from that physician in person, orally and in private.  See Act, §36-2153(A)(1)&(3).  This information must include:

      a.    "The name of the physician who will perform the abortion."

      b.    "The nature of the proposed procedure or treatment.

      c.    "The immediate and long-term medical risks associated with the procedure that a reasonable patient would consider material to the decision of whether or not to undergo the abortion.

      d.    "Alternatives to the procedure or treatment that a reasonable patient would consider material to the decision of whether or not to undergo the abortion.

      e.    "The probable gestational age of the unborn child at the time the abortion is to be performed."

      f.    "The probable anatomical and physiological characteristics of the unborn child at the time the abortion is to be performed."

24.    The Act also requires the patient to receive additional state-mandated information from the physician or from a qualified physician, physician assistant, nurse, psychologist or licensed behavioral health professional to whom the responsibility has been delegated by either the physician who is to perform the abortion or the referring

physician, in person, orally and in private, at least twenty-four hours prior to the abortion. *See* Act §36-2153(A)(2)&(3).  The patient must be informed that:

    a.  "Medical assistance benefits may be available for prenatal care, childbirth and neonatal care."

    b.  "The father of the unborn child is liable to assist in the support of the child even if he has offered to pay for the abortion."

    c.  "Public and private agencies and services are available to assist the woman during her pregnancy and after the birth of her child if she chooses not to have an abortion whether she chooses to keep the child or place the child for adoption."

    d.  "It is unlawful for any person to coerce a woman to undergo an abortion."

The information listed in "b" may be omitted "in the case of rape or incest."

    25.    The Act permits physicians to waive the requirements of §§ 36-2153(A)(1),(2),(3) in cases of "medical emergency" and defines "medical emergency" as "a condition that, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman so as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function."

    26.    The Act also provides that "a person shall not write or communicate a prescription for a drug or drugs to induce an abortion or require or obtain payment for a service provided to a patient who has inquired about an abortion or scheduled an abortion until the expiration of the twenty-four hour reflection period required by subsection A." *See* Act, §36-2153(D).

    27.    The Act specifies that a "physician who knowingly violates [§ 36-2153] commits an act of unprofessional conduct and is subject to license suspension or revocation pursuant to Title 32, Chapter 13 or 17."  *See* Act § 36-2153(F).

28.     The Act also provides all physicians and all employees of a "hospital, clinic or other medical or surgical facility in which an abortion has been authorized" with the right to refuse to "facilitate or participate in the medical or surgical procedure that will result in the abortion,"  and provides all employees of pharmacies, hospitals, or health professionals to refuse to "facilitate or participate in the provision of an abortion, abortion medication, emergency contraception, or any medication or device intended to inhibit or prevent implantation of a fertilized ovum."  *See* Act, § 36-2154(A)&(B).

## V.     STATEMENT OF FACTS

29.     Women in Arizona seek abortions for a variety of physical health, psychological, familial, economic, and personal reasons.  In 2007, 10,486 women had abortions in Arizona.

30.     Many women in Arizona seek abortions because they suffer from medical conditions making it dangerous or unhealthy to carry a pregnancy to term, such as diabetes, cancer, essential hypertension, cardiac disease, kidney disease, history of post-partum hemorrhaging or sickle cell anemia, or develop other conditions during their pregnancy.  These medical conditions are serious but may not meet the narrow "medical emergency" exception contained in the Act.

31.     Other women seek abortions because of their age, because they are pregnant as a result of rape or incest, or because there are or may be genetic anomalies in the fetus, some of which are fatal to the fetus.

32.     Other women seek abortions because they are in abusive relationships and seek abortions for reasons including fear of further abuse or a diminished ability to leave the relationship if they carry their pregnancies to term.

33.     Other women seek abortions because they have determined, based on their own life circumstances, including socio-economic reasons, that they do not wish to carry a pregnancy to term at this time.

34.     Women who seek abortions are disproportionately low income and many have difficulty gathering the funds necessary to pay for their abortions and for attendant costs such as travel and childcare.  Moreover, low-income women often have difficulty making the arrangements necessary to obtain abortions, because they cannot miss work, do not have sick days, or lack transportation.

35.     Women in abusive relationships also often have difficulty making the arrangements to obtain abortions, both because they often need to conceal their intention to get an abortion from their abuser and because their abusers generally restrict their whereabouts and access to money.

36.     It is important to many women that their abortion decision remains confidential from one or more person(s) in their life.

37.     Abortion at any stage of pregnancy is considered one of the safest surgical procedures.  The risks of childbirth are far greater than those of abortion.

38.     Delay in the performance of abortion exponentially increases the health risks that women face in connection with the procedure.

39.     Consistent with state law and medical ethics, Plaintiff abortion providers currently ensure that every woman has given informed and voluntary consent to the abortion procedure before performing the procedure.  This consent is required for any medical procedure independent of the purported "informed consent" requirements mandated by the Act.

40.     Plaintiff abortion providers use trained non-physicians to provide all abortion patients with informed consent information and counseling, including information about the nature and risks of the abortion procedure and alternatives to abortion, including prenatal care, foster care and adoption.   Counselors fully discus the woman's situation with her to determine whether she has fully considered and is firm about her decision.

41.     Before the abortion procedure, Plaintiffs abortion providers meet individually with each patient and answer the woman's questions.  They also ascertain whether she has given informed and voluntary consent to the abortion.

42.     Plaintiffs Richardson and Isaacson and their staff encourage women who indicate ambivalence about proceeding with the abortion to delay the procedure. Only if the woman is firm in her decision to have an abortion will plaintiff physicians proceed with the abortion.

43.     It is standard and accepted practice throughout the medical profession to use non-physicians, or a physician other than the one who will perform the medical procedure, to provide patients with medical information pertinent to informed consent.

44.     It is standard practice in the medical profession to require payment for services on the day on which they are rendered, particularly when the services provided are not being paid for by insurance.

45.      All plaintiffs require payment for services on the day on which they are to be provided.  This includes co-payments for insurance when the services will be covered by insurance.

46.     It is standard medical practice to charge for all services provided to patients that require physicians' time, including counseling on medical procedures.

47.     The Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd (2009) requires all hospitals in the United States with emergency departments to do the following: When a patient presents at the emergency room, the hospital must (1) "provide for an appropriate medical screening examination within the capability of the hospital's emergency department . . .  to determine whether or not an emergency medical condition exists" and ,if the hospital determines that an emergency condition does exist, (2)  "provide either . . . for such further medical examination and such treatment as may be required to stabilize the medical condition, or . . . for transfer of

the individual to another medical facility" for such treatment as long as the transfer complies with certain requirements, including that it be in the patient's medical best interests. *Id.* at § 13955(dd)(a)-(c).

48.     It is standard medical practice to require ancillary staff to facilitate all patient care, while not requiring those who object to a particular procedure to participate directly in the objected-to procedure, except in cases of medical emergency or need.  It is not standard medical practice to permit any employee, no matter how tangentially connected to the procedure, to refuse to engage in any task that might "facilitate" any particular patient's care.

## VI.   THE IMPACT OF ARIZONA HB 2564 ON PHYSICIANS WHO PROVIDE ABORTIONS AND THEIR PATIENTS

49.     Arizona House Bill 2564 subjects those who provide abortions and those who provide health services to patients who seek information about abortion, and thus their patients, to unique and severe constraints.   For no other medical procedure does the state mandate a delay of at least 24 hours between the patient's "informed consent" and treatment.  For no other procedure does the state dictate detailed instructions to doctors about what medical and/or "social service" information must be provided in order to obtain a patient's "informed consent."  For no other service does the state prevent a physician from using his medical judgment regarding the information that would be relevant and helpful for informed consent.  Finally, in no other situation in medical practice in Arizona is a physician prohibited from charging for services provided to a patient at the time of service if the patient mentions or seeks to schedule a particular type of medical procedure.

### A.   <u>The Mandatory 24-Hour Delay, Two Trip, and Biased Counseling Requirements</u>

50.     The mandatory delay required by HB 2564 constitutes a direct and substantial burden and unwarranted interference in the physician-patient relationship.

Except in limited circumstances, the Act prevents the physician and patient from deciding when an abortion in less than 24 hours is in the best interest of the patient's health and well-being.

51.     The mandatory delay will be injurious to women needing abortions.  In particular, the delay will be harmful to low-income women who have difficulty raising the funds, taking time off from work, and making necessary arrangements for the abortion.  It will also be injurious to women who are physically sick, to women pregnant as a result of rape or incest, to women who are in abusive relationships, and women pregnant with anomalous fetuses.  For many such women, the mandated delay will cause psychological or emotional harm.

52.     Even a 24-hour delay can impose pain, discomfort or increased health risks.

53.     In some circumstances, delaying an abortion for even 24 hours substantially jeopardizes a woman's health, but not so severely as to fall within HB 2564's medical emergency exception.

54.     HB 2564 requires women to make at least two separate trips to a health care provider -- one to receive the mandated oral information and one for the procedure.  In addition, a second-trimester abortion can take two or even three consecutive days.  In these circumstances, HB 2564 may require women to make three or four trips to the clinic, respectively, which may force her to delay the abortion until the following week..

55.     Many Arizona women seeking abortions are low-income and can barely afford the procedure, and travel, childcare and missed work costs attendant to it.

56.     Because of the scarcity of abortion providers in some areas of Arizona many woman travel long distances at considerable expense to obtain abortions.

57.     The 24-hour mandatory delay will substantially interfere with the ability of some women to obtain an abortion.  Multiple long-distance trips to a clinic or an overnight stay significantly increase a woman's travel and lodging costs, child care

expenses, and the amount of time, wages, or other compensation lost from work.  These additional costs will be prohibitive for some low-income women or working women without sick leave.

58.    For some women, including women in abusive relationships and low-income women, HB 2564 will create delays in excess of 24 hours, as many of these women will be unable to make trips on two consecutive days.

59.     Each week of delay for obtaining an abortion procedure appreciably increases the health risks associated with the procedure.

60.    The additional travel, financial and logistical burdens imposed by HB 2564 will cause some low-income Arizona women to carry their pregnancies to term.

61.    HB 2564's 2-trip requirement will create a severe impediment for women for whom confidentiality regarding their abortion is imperative, including battered women, young women, and working women without sick leave.  For these women, compliance with HB 2564 would in some circumstances give others -- the abuser of a battered woman, parents of a young woman, school officials or an employer -- constructive notice of, and sometimes effective veto power over, the woman's decision to have an abortion.  As a result, for some women, the two-trip requirement will increase the likelihood of abuse.

62.    By making it more difficult for some abortion patients to maintain the confidentiality of their procedure, the mandatory delay/two-trip requirement will deter some women from getting abortions at all, and it will force other women to involuntarily disclose their decision to people from whom they wished to keep their decision secret.

63.    Plaintiff physicians' clinics are frequently the object of protests.  HB 2564 will force women to experience on two separate occasions the hostility and harassment of abortion opponents.  This repeated harassment will cause some women, including victims of rape, incest or abuse, severe psychological harm.

64.     Prior to seeking medical treatment, the overwhelming majority of women who seek abortions have given careful thought and moral deliberation to the matter and have concluded in accordance with their own life circumstances that an abortion is in their best interest.  In addition, plaintiffs already follow medically accepted informed consent procedures and do not perform abortions if a woman expresses doubt about her decision.  Thus, delay mandated by the statute will not enhance women's decision-making and serves no legitimate state interest.

65.     In sum, for women in abusive relationships, low-income women, women who have no sick leave or who will otherwise have great difficulty returning to the clinic twice, women pregnant as a result of rape or incest, women who discover severe or fatal fetal anomalies or health conditions that make carrying the fetus to term a threat to their own health, and women for whom it is important to keep their abortion confidential, HB 2564's multiple trip requirement will impose substantial obstacles, which will in some circumstances (a) prevent the woman from getting an abortion, (b) significantly delay the abortion, appreciably increasing health risks and costs, (c) exacerbate existing medical conditions, (d) cause psychological or emotional harm, and/or (e) cause their abortions to be disclosed to individuals from whom they intended and needed to keep the abortion confidential.

66.     In addition, AZ HB 2564 requires that specific categories of oral information be provided to each woman seeking an abortion.  Although the physician may omit the information that "the father of the unborn fetus is legally required to assist in the support of the child" in the case of a woman pregnant as a result of rape or incest, the physician may not omit or alter any of the other information mandated by HB 2564, except in the narrowly defined cases that constitute a "medical emergency."  As a result, a health care provider is unable to tailor the information necessary for informed consent to the individual needs of each patient.  These provisions substantially interfere with the

practice of medicine and force the physician to act contrary to his or her best medical judgment, and against the medical interests of his or her patients.

67.     Thus, women with medical reasons for the abortion, women pregnant as a result of rape or incest, battered women, women pregnant with anomalous fetuses, and other women with special psychological needs, all must receive the litany of information mandated by the Act, regardless of the physical or psychological impact it has on them.

68.     Finally, the lack of a sufficiently broad medical emergency exception means that even when physicians believe in their good medical judgment that their patients require an immediate abortion, such as in cases of inevitable abortion, premature ruptured membranes, preeclampsia, hypertension, and poorly controlled diabetes (if the patient is developing ketoaciduria), the physician may be unable to provide the abortion until after the twenty-four hour waiting period.

69.     Each of these violations of constitutional rights constitutes an irreparable harm to abortion patients, physicians who provide abortions, or both.

**B.     <u>The Payment Provision</u>**

70.     Medical professionals generally require payment for services on the day they are provided or, in the case of services covered by insurance, require a co-payment on the day on which the services is provided.

71.     AZ HB 2564 prohibits physicians or others from requiring payment for services already provided in situations in which a patient inquires about abortion until twenty-four hours after the patient has received the required informed consent counseling under the Act.   Thus, physicians, including abortion providers and other physicians, will no longer be able to charge their patients for services already provided on the date of service if the patient inquires about abortion.

72.     This provision is vague and fails to provide guidance to physicians as to how to comply with its requirements and seek payment for services rendered to patients who inquire about abortion.

73.     In order to bill their patients for the services they have provided, physicians will have to wait until after the patient has left and later investigate whether their patients sought an abortion or counseling at some later point, interfering with their patients' privacy and perhaps causing their patients to lose confidentiality.   In cases in which they cannot determine whether these conditions were met, the physicians will be unable to recover fees for their services.

74.     Alternatively, physicians whose patients inquire about abortion could attempt to comply with the requirements of this provision by immediately providing abortion counseling, even if the patient does not currently intend to seek an abortion, and then seek payment twenty-four hours later.  Such counseling will be confusing, and possibly psychologically harmful, to patients who are not actually seeking abortions, especially those with unclear test results or troubled pregnancies who hope to carry to term.   Some physicians will thus be forced to choose between violating their medical ethics by providing harmful counseling to non-abortion patients or foregoing payment for their services.  Moreover, even if they give the counseling, the physicians will be unable to actually fulfill the requirements of the statute, because they will not be able to tell the patient "the name of the physician who will perform the abortion" if no such abortion has been scheduled.

75.     Accordingly, physicians who provide services other than abortions to patients who inquire about abortion will risk violating their patients' privacy or violating the Act if they attempt to recover payment for those other services.

76.     Each of these violations of constitutional rights constitutes an irreparable harm to physicians, including physicians who provide abortions and all other physicians whose patients inquire about abortions.

### FIRST CLAIM FOR RELIEF

77.     Plaintiffs reallege and hereby incorporate by reference Paragraphs 1 through 76 above.

78.     By prohibiting women who seek abortions in Arizona from obtaining abortions on their first visit to an abortion clinic, instead requiring them to come to an abortion facility in-person to receive state-mandated counseling and then wait at least twenty-four hours before returning to the clinic for an abortion, except in cases of medical emergency, and subjecting some women to significant health risks that do not come within the "medical emergency" exception, § 36-2153(A)  of the Act violates Plaintiffs' patients rights to privacy and liberty guaranteed by the Due Process Clause of the Fourteenth Amendment and 42 U.S.C. § 1983.

### SECOND CLAIM FOR RELIEF

79.     Plaintiffs reallege and hereby incorporate by reference Paragraphs 1 through 78 above.

80.     By attempting to single out abortion providers from all other medical providers for a prohibition on obtaining prompt payment for medical services without serving any legitimate state interests, §36-2153(D) of the Act infringes the Plaintiff abortion providers' rights to equal protection of the law, in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

### THIRD CLAIM FOR RELIEF

81.     Plaintiffs reallege and hereby incorporate by reference Paragraphs 1 through 80 above.

82.     By failing to give adequate notice of the conduct it proscribes, and thereby encouraging arbitrary enforcement of its terms, §36-2153(D) of the Act is void for vagueness in violation of the Plaintiff physicians' right to due process under the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

## FOURTH CLAIM FOR RELIEF

83.     Plaintiffs reallege and hereby incorporate by reference Paragraphs 1 through 82 above.

84.     By requiring physicians to delay charging their patients for services they have provided if their patients inquire about an abortion, and by preventing physicians from charging for some of these services altogether, thereby requiring physicians to provide uncompensated services to patients at the state's behest, §36-2153(D) of the Act will result in a government taking of Plaintiffs' private property without a public purpose and without compensation and is a violation of the Takings Clause of the Fifth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

## FIFTH CLAIM FOR RELIEF

85.     Plaintiffs reallege and hereby incorporate by reference Paragraphs 1 through 84 above.

86.     By permitting any "hospital" to refuse "to facilitate or participate in the provision of an abortion" without any exception for women needing abortions for reasons of medical emergency, § 36-2154(B) of the Act conflicts with provisions of the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd(a)-(b) (2009), which requires all hospitals faced with patients in emergency situations to determine appropriate medical care, and then either stabilize or, only if in the patients' medical best interests, transfer the patients elsewhere, and is therefore preempted by the Supremacy Clause of United States Constitution, Art. VI, cl. 2.

**INJUNCTIVE RELIEF**

87.     Plaintiffs reallege and hereby incorporate by reference Paragraphs 1 through 86 above.

88.     Plaintiffs' claims meet the standard for injunctive relief.  Plaintiffs have no adequate remedy at law and they and their patients will suffer immediate and irreparable injury if §§ 36-2153(A),(D) and 36-2154(B) of the Act are permitted to go into effect and be applied to them.  Moreover, Plaintiffs have a strong likelihood of success on the merits of their claims, and the public interest will be served and Defendants not significantly harmed if Defendants are enjoined from enforcing those provisions during the pendency of this action.

**ATTORNEY'S FEES**

89.     Plaintiffs reallege and hereby incorporate by reference Paragraphs 1 through 88 above.

90.     Plaintiffs are entitled to an award of reasonable attorney's fees and expenses pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiffs ask this Court:

A.     To issue a declaratory judgment that §36-2153(A) & (D) of Arizona House Bill 2564 violates the rights of Plaintiffs and their patients as protected by the Fifth and Fourteenth amendments to the United States Constitution;

B.     To issue a declaratory judgment that §36-2153(A) & (D) of  Arizona House Bill 2564 as applied by the Defendants to the Plaintiffs violates the rights of Plaintiffs and their patients as protected by the Fifth and Fourteenth amendments to the United States Constitution;

C.     To issue a declaratory judgment that § 36-2154(B) violates the rights of Plaintiffs and their patients as protected by EMTALA, 42 U.S.C. § 1395dd(a)-(b).

D.      To issue a preliminary injunction restraining Defendants, their employees, agents, and successors from enforcing §36-2153(A) & (D) of Arizona House Bill 2564 against Plaintiffs.

E.      To issue a preliminary injunction restraining Defendants, their employees, agents, and successors from enforcing §36-2153(A) & (D) of Arizona House Bill 2564.

F.      In the alternative, to issue a temporary restraining order restraining Defendants, their employees, agents, and successors from enforcing §36-2153(A) & (D) of Arizona House Bill 2564, and to schedule a hearing to determine whether to issue a preliminary injunction to do the same.

G.      To enter judgment declaring §36-2153(A) & (D) of Arizona House Bill 2564 to be in violation of the United States Constitution, and 42 U.S.C. § 1983;

H.      To enter judgment declaring §36-2154(B) of Arizona House Bill 2564 to be in violation of federal law and therefore preempted under the Supremacy Clause of the United States Constitution;

I.      To issue an order permanently enjoining §36-2153(A) & (D) and § 36-2154(B) of Arizona House Bill 2564; and

F.      To award Plaintiffs their reasonable costs and attorneys fees pursuant to 42 U.S.C. § 1988; and

G.      To grant such other and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 14th day of September, 2009.

LAVOY & CHERNOFF, PC


By /s/  Christopher A. La Voy
     Christopher A. LaVoy
     201 North Central Avenue, Suite 3300
     Phoenix, Arizona 85004-1052

     Suzanne Novak*
     Jordan Goldberg*
     Center for Reproductive Rights
     120 Wall Street, 14th Floor
     New York, New York 10005
     snovak@reprorights.org
     jgoldberg@reprorights.org
     Tel: (917) 637-3600

     Aimee H. Goldstein**
     James G. Gamble**
     Simpson Thacher & Bartlett LLP
     425 Lexington Avenue
     New York, New York 10017
     Tel:  (212) 455-2000
     agoldstein@stblaw.com
     jgamble@stblaw.com

     *Attorneys for plaintiffs*

*Application for admission *pro hac vice* filed
**Application for admission *pro hac vice* forthcoming