1  **WO**

2

3

4

5

6          **IN THE UNITED STATES DISTRICT COURT**

7              **FOR THE DISTRICT OF ARIZONA**

8

9   Tucson Women's Center; Family          )   No. CV-09-1909-PHX-DGC
    Planning Associates; William           )
10  Richardson, M.D.; Paul A. Isaacson,    )   **ORDER CERTIFYING QUESTION TO**
    M.D.; and Frank Laudonio, M.D.,        )   **THE ARIZONA SUPREME COURT**
11                                         )
            Plaintiffs,                    )
12                                         )
    vs.                                    )
13                                         )
    Arizona Medical Board; Lisa Wynn, in   )
14  her official capacity as Executive     )
    Director of the Arizona Medical Board; )
15  and Terry Goddard, in his official     )
    capacity as Attorney General of Arizona, )
16                                         )
            Defendants.                    )
17  _____ )

18          Arizona House Bill 2564 ("the Act") amends Arizona law relating to abortions. The

19  Act was passed by the Arizona Legislature and signed by the Governor in July 2009, and

20  becomes effective today. Among other things, the Act adds A.R.S. § 36-2153.

21          Section 36-2153(A) prohibits, except in the case of a medical emergency, the

22  performance of an abortion unless, at least 24 hours before the abortion, the patient gives

23  consent after having received certain statutorily-prescribed information. Section 36-2153(D)

24  then provides:

25          A person shall not write or communicate a prescription for a drug or drugs to
            induce an abortion or require or obtain payment for a service provided to a
26          patient who has inquired about an abortion or scheduled an abortion until the
            expiration of the twenty-four hour reflection period required by subsection A.
27

28  A.R.S. § 36-2153(D).

Plaintiffs challenge the payment provision of section 36-2153(D) as unconstitutionally vague. Dkt. #1 ¶¶ 70-76, 81-82. No Arizona appellate court has interpreted section 36-2153(D). The meaning of that provision presents a question of state law that may be determinative of a claim in this action. Pursuant to A.R.S. § 12-1861 and Rule 27 of the Rules of the Arizona Supreme Court, the Court certifies the following question to the Arizona Supreme Court:

> Whether the payment provision of A.R.S. § 36-2153(D) applies only when the informed consent and 24-hour waiting period of A.R.S. § 36-2153(A) is triggered by the actual providing or inducing of an abortion, or whether it applies outside the abortion context whenever an inquiry about abortion is made to a health care provider.

Because the certified question is one of law, the Court will not provide a statement of facts. *See* Ariz. R. Sup. Ct. 27(3)(B). The Court addressed the interpretation of A.R.S. § 36-2153(D) in an order dated September 29, 2009, a copy of which is attached to this order. The following is a list of counsel appearing in this matter. *See* Ariz. R. Sup. Ct. 27(3)(C).

Counsel for Plaintiffs:

Suzzane Novak and Jordan Goldberg, Center for Reproductive Rights, 120 Wall Street, 14th Floor, New York, NY 10005, (917) 637-3600.

Aimee Goldstein, James Gamble, and Jayma Meyer, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017, (212) 455-2000.

Christopher LaVoy, Lavoy & Chernoff PC, 201 North Central Avenue, Suite 3300, Phoenix, AZ 85004, (602) 253-3330.

Counsel for Defendants:

Paula Bickett, Carrie Brennan, Gregory Honig, and Mary O'Grady, Office of the Attorney General, 1275 West Washington Street, Phoenix, AZ 85007, (602) 542-3333.

**IT IS ORDERED:**

1. The following question is certified to the Arizona Supreme Court pursuant to A.R.S. § 12-1861 and Rule 27 of the Rules of the Arizona Supreme Court: Whether the payment provision of A.R.S. § 36-2153(D) applies only when the informed consent and 24-hour waiting period of A.R.S. § 36-2153(A) is

1   triggered by the actual providing or inducing of an abortion, or whether it

2   applies outside the abortion context whenever an inquiry about abortion is

3   made to a health care provider.

4   2.      The Clerk is directed to file with the Arizona Supreme Court the original and

5   six copies of this certification order.  The Clerk  shall transmit to the Arizona

6   Supreme Court the original or copies of such other portions of the Court's

7   record as the Arizona Supreme Court may deem necessary to a determination

8   of the certified question.

9   DATED this 30th day of September, 2009.

_____
David G. Campbell
United States District Judge

1  **WO**

2

3

4

5  **IN THE UNITED STATES DISTRICT COURT**

6  **FOR THE DISTRICT OF ARIZONA**

7

8  Tucson Women's Center; Family )   No. CV-09-1909-PHX-DGC
   Planning Associates; William )
9  Richardson, M.D.; Paul A. Isaacson, )   **ORDER**
   M.D.; and Frank Laudonio, M.D., )
10                                    )
        Plaintiffs,                   )
11                                    )
   vs.                                )
12                                    )
   Arizona Medical Board; Lisa Wynn, in )
13 her official capacity as Executive )
   Director of the Arizona Medical Board; )
14 and Terry Goddard, in his official )
   capacity as Attorney General of Arizona, )
15                                    )
        Defendants.                   )
16 _____ )

17        Arizona House Bill 2564, which will be referred to in this order as "the Act," amends

18 Arizona law relating to abortions. The Act was passed by the Arizona Legislature and signed

19 by the Governor in July of 2009, and becomes effective tomorrow. Among other things, the

20 Act prohibits an abortion unless the patient has received certain statutorily-prescribed

21 information, has then waited 24 hours before receiving an abortion, and has consented to the

22 abortion in writing. A.R.S. § 36-2153(A). The 24-hour waiting period does not apply in

23 cases of medical emergency as defined in the Act. *Id.*; A.R.S. § 36-2151(5). The Act also

24 states that a person who provides services to a patient who has inquired about or scheduled

25 an abortion may not obtain payment for those services until after the 24-hour waiting period

26 has expired. A.R.S. § 36-2153(D).

27        Plaintiffs claim that the 24-hour provision unconstitutionally burdens a woman's right

28 to an abortion and that the payment provision is unconstitutionally vague. Plaintiffs ask the

Court to enter a preliminary injunction prohibiting enforcement of these provisions. For reasons set forth below, the Court concludes that Plaintiffs have failed to show that they are likely to prevail on the merits of these constitutional claims. The Court therefore will deny Plaintiffs' request for a preliminary injunction. The Court will certify to the Arizona Supreme Court a question concerning the proper construction of the payment provision.

## I.    Parties and Proceedings.

Plaintiff Tucson Women's Center is a medical facility that offers a variety of reproductive healthcare services, including abortions. Plaintiff William Richardson, M.D., operates the center and is a physician licensed to practice medicine in Arizona. Plaintiff Family Planning Associates is a reproductive healthcare facility located in Phoenix. Plaintiff Paul Isaacson, M.D., a licensed physician, is a co-owner of the facility. Plaintiff Frank Laudonio, M.D., is a licensed physician certified in obstetrics and gynecology who provides referrals for abortions, but does not perform them himself.

On September 14, 2009, Plaintiffs filed a complaint challenging the constitutionality of various provisions of the Act including, among others, the 24-hour waiting period and the payment provision. Dkt. #1. Plaintiffs bring the complaint under 42 U.S.C. § 1983 and the United States Constitution. *Id.* ¶ 2. All Plaintiffs except Dr. Laudonio sue on their own behalf and on behalf of their respective patients. *Id.* ¶¶ 14-18.

Defendants are the Arizona Medical Board, Lisa Wynn in her official capacity as the Executive Director of the Board, and Arizona Attorney General Terry Goddard. The Arizona Medical Board is responsible for enforcing the Act.

Certain other individuals and groups have sought to intervene in this case as defendants. They include the American Association of Pro-Life Obstetricians and Gynecologists, Catholic Medical Association, Christian Medical and Dental Associations, Christian Pharmacists Fellowship International, Ave Maria Pharmacy, PLLC, Arizona Catholic Conference, Crisis Pregnancy Centers of Greater Phoenix, Senator Linda Gray, and Representative Nancy Barto. Because time did not permit the briefing and consideration of their request to intervene before the preliminary injunction motion must be resolved, the

1    Court permitted these groups to file a memorandum as *amicus curiae*. Dkt. #44.

2    Plaintiffs filed their motion for preliminary injunction on September 14, 2009, and

3    seek a ruling before the Act's effective date of September 30, 2009. Dkt. ##5-6. Defendants

4    have filed a response in opposition to the motion (Dkt. #51), the proposed intervenors have

5    filed an opposing memorandum (Dkt. #52), and Plaintiffs have filed a reply (Dkt. #56). The

6    Court held oral argument on September 29, 2009.

7    **II.    Preliminary Injunction Standard.**

8    Plaintiffs bear the burden of establishing their right to a preliminary injunction.

9    Plaintiffs must show that (1) they are likely to succeed on the merits, (2) they are likely to

10   suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips

11   in their favor, and (4) an injunction is in the public interest. *See Winter v. NRDC, Inc.*, ---

12   U.S. ---, 129 S. Ct. 365, 374 (2008); *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559

13   F.3d 1046, 1052 (9th Cir. 2009).

14   **III.   Twenty-Four Hour Informed Consent Period.**

15   The Act provides that "[a]n abortion shall not be performed or induced without the

16   voluntary and informed consent of the [patient]." A.R.S. § 36-2153(A). Except in the case

17   of a medical emergency, consent to an abortion is informed only if two conditions are met.

18   The conditions can be summarized as follows:

19   1.     At least twenty-four hours before the abortion, the physician who is to
20   perform the abortion or the referring physician must inform the woman of (a)
     the name of the physician who will perform the abortion, (b) the nature of the
21   proposed procedure, (c) the immediate and long-term medical risks associated
     with the procedure, (d) alternatives to the procedure, (e) the probable
22   gestational age of the unborn child, (f) the probable anatomical and
     physiological characteristics of the unborn child, and (g) the medical risks
23   associated with carrying the child to term.

24   2.     At least twenty-four hours before the abortion, the physician who is to
     perform the abortion, the referring physician, or a delegated medical
25   professional, must inform the woman that (a) medical assistance benefits may
     be available for prenatal care, childbirth, and neonatal care, (b) the father of
26   the unborn child is liable to assist in child support even if he has offered to pay
     for the abortion, (c) agencies and services are available to assist the woman
27   during her pregnancy and after giving birth, (d) it is unlawful for any person
     to coerce a woman to undergo an abortion, and (e) the woman is free to
28   withhold or withdraw her consent at any time without affecting her right to
     future care and without loss of any state or federal benefits.

1   *See* A.R.S. § 36-2153(A)(1)-(2).   This information must be provided to the woman

2   individually and in private, § 36-2153(A)(3), and the woman must certify in writing that she

3   has received the information, § 36-2153(A)(4).[1]  Reflecting their respective views, Plaintiffs

4   refer to this section as the "two trip/biased counseling" provision; Defendants call it the

5   "informed consent/24 hour waiting period."  The Court will refer to it simply as the "24-hour

6   provision."

7        Plaintiffs contend that the 24-hour provision violates a woman's constitutional right

8   to an abortion as recognized in *Roe v. Wade*, 410 U.S. 113 (1973).  Plaintiffs specifically rely

9   on the analysis established by the Supreme Court in *Planned Parenthood of Southeast*

10  *Pennsylvania v. Casey*, 505 U.S. 833 (1992).[2]

11       *Casey* concerned a Pennsylvania abortion statute that established a 24-hour waiting

12  period like the one in this case, required married women to inform their husbands of an

13  abortion, required minors to obtain their parents' consent to an abortion, and imposed other

14  record keeping and reporting requirements on abortion providers.  The constitutionality of

15  the Pennsylvania statute was challenged by five abortion clinics and a class of physicians.

16  At issue was whether the Supreme Court would adhere to the constitutional right recognized

17  in *Roe* and, if so, how far States could go in regulating abortions.

18       The Supreme Court confirmed the constitutional right to an abortion.  *Casey* held that

19  "it is a constitutional liberty of the woman to have some freedom to terminate her pregnancy.

20  We conclude that the basic decision in *Roe* was based on a constitutional analysis which we

21  cannot now repudiate."  *Id.* at 869.  *Casey* also held, however, that "[t]he woman's liberty

22

23       [1] The disclosure that the father is liable to provide child support need not be provided

24  in the case of rape or incest.  A.R.S. § 36-2153(A)(2)(B).

25       [2] *Casey* included a number of opinions from Supreme Court justices.  Plaintiffs and
    Defendants cite the plurality opinion of Justices O'Connor, Kennedy, and Souter.  Because
26  the undue burden analysis adopted in the plurality opinion was "the narrowest ground for the
    Court's holding" in *Casey*, "it is as binding on the lower courts as would be a majority
27  opinion."  *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 921 n.11 (9th Cir.
28  2004).  The Court will cite to the plurality opinion throughout this decision, referring to it
    simply as the *Casey* decision.

1   is not so unlimited . . . that from the outset the State cannot show its concern for the life of

2   the unborn[.]" *Id.* Seeking to protect the woman's right to an abortion while leaving room

3   for States to pursue their interest in the life of the fetus, *Casey* adopted an "undue burden"

4   test, holding that State restrictions on abortion are legal so long as they do not place an undue

5   burden on women seeking abortions. *Id.* at 878. "An undue burden exists, and therefore a

6   provision of law is invalid," *Casey* held, if the "purpose or effect" of the law "is to place a

7   substantial obstacle in the path of a woman seeking an abortion before the fetus attains

8   viability." *Id.* Applying the undue burden test, *Casey* identified the group of women on

9   whom the law would have an effect and then considered whether the law imposed a

10   "substantial obstacle" to obtaining an abortion on a "large fraction" of those women. If so,

11   *Casey* held, the statute would impose an undue burden on the right to an abortion and is

12   therefore invalid. *Id.* at 894-95.

13       Plaintiffs contend that the 24-hour provision places an undue burden on women

14   seeking abortions in Arizona. To obtain a preliminary injunction, Plaintiffs must show that

15   they are likely to prevail on this claim. Using the *Casey* analysis, the Court will define the

16   relevant group and then determine whether Plaintiffs are likely to prevail in their assertion

17   that the 24-hour provision places a substantial obstacle in the path of a large fraction of the

18   women in that group.[3]

19       **A.     The Relevant Group.**

20       Plaintiffs provide the Court with declarations from 92 Arizona abortion patients

21   concerning possible effects of the 24-hour provision. Plaintiffs note that 80 of the 92 women

22   report that the 24-hour period will have some negative effect on their right to an abortion.

23   Plaintiffs contend, therefore, that the relevant group consists of 80 women.

24       Defendants contend that the relevant group consists not of women on whom the law

25   will have a negative effect, but of women on whom it will have any effect. Defendants

26   contend that the relevant group is therefore all 92 women who provided declarations.

27   _____

28       [3] Plaintiffs state that they are bringing both facial and as-applied challenges to the Act.
    Dkt. #6 at 6. At oral argument, Plaintiffs agreed that the *Casey* analysis governs both.

1    Defendants are correct. *Casey* did not define the relevant group as women on whom

2    the abortion regulation has a "negative impact" as Plaintiffs contend. *See* Dkt. #56 at 8.[4]

3    *Casey* identified the relevant group as women on whom the law would have some effect:

> Legislation is measured for consistency with the Constitution by its impact on
> *those whose conduct it affects....* The proper focus of constitutional inquiry
> is the group for whom the law is a restriction, not the group for whom the law
> is irrelevant.... [The statute] must be judged by reference to *those for whom
> it is an actual rather than an irrelevant restriction.*

7    505 U.S. at 894-95 (emphasis added). The Ninth Circuit likewise defines the relevant group

8    as "those upon whom a challenged law would have some actual effect." *Planned Parenthood*

9    *of Idaho, Inc. v. Wasden*, 376 F.3d 908, 921 (9th Cir. 2004).

10   *Casey* found that the spouse-notification requirement of the Pennsylvania statute

11   would affect only the one percent of married women who would not otherwise notify their

12   spouses of an abortion. 505 U.S. at 894-95. The law would have no effect on women who

13   already intended to notify their spouses – they would give the notice regardless of the statute.

14   In this case, the 24-hour provision has an effect on all women who would not

15   otherwise wait 24 hours to have an abortion. The provision requires these women to wait 24

16   hours they would not otherwise wait. The provision also constitutes a restriction on these

17   women – absent a medical emergency, it restricts their right to have an abortion immediately.

18   Because none of the women who submitted declarations stated that they would have waited

19   24 hours for their abortion in the absence of the statute, all of them are affected by the statute

20   and included in the relevant group.

21   **B.    Substantial Obstacle.**

22   In *Casey*, the Supreme Court held that a 24-hour waiting period substantially identical

23   to the Arizona provision did not impose an undue burden on the right to obtain an abortion.

24   In doing so, the Court shed light on the meaning of the substantial obstacle requirement.

25   *Casey* held that States may require that women be fully informed of the nature and

26   consequences of their abortions, and may even advocate for childbirth over abortion: "To

27

28   [4] Citations to page numbers will be to the numbers assigned by the Court's electronic docket (at the top of the page), not to page numbers in the documents themselves.

promote the State's profound interest in potential life, throughout pregnancy the State may take measures to ensure that the woman's choice is informed, and measures designed to advance this interest will not be invalidated as long as their purpose is to persuade the woman to choose childbirth over abortion." *Id.* at 878. *Casey* made clear that the State's pursuit of this interest may not impose an undue burden on a woman's right to an abortion, *id.*, but held that requiring informed consent does not itself constitute such a burden:

> [W]e permit a State to further its legitimate goal of protecting the life of the unborn by enacting legislation aimed at ensuring a decision that is mature and informed, even when in so doing the State expresses a preference for childbirth over abortion. In short, requiring that the woman be informed of the availability of information relating to fetal development and the assistance available should she decide to carry the pregnancy to full term is a reasonable measure to ensure an informed choice, one which might cause the woman to choose childbirth over abortion. This requirement cannot be considered a substantial obstacle to obtaining an abortion, and, it follows, there is no undue burden.

*Id.* at 883.

Casey also shed light on the level of hardship necessary for a "substantial obstacle." *Casey* accepted the district court's finding that Pennsylvania's 24-hour waiting period would result in greater inconvenience and expense for women seeking abortions, even to the point of being "particularly burdensome," but held that this did not constitute a substantial obstacle sufficient to invalidate the statute:

> The findings of fact by the District Court indicate that because of the distances many women must travel to reach an abortion provider, the practical effect will often be a delay of much more than a day because the waiting period requires that a woman seeking an abortion make at least two visits to the doctor. The District Court also found that in many instances this will increase the exposure of women seeking abortions to the harassment and hostility of anti-abortion protestors demonstrating outside a clinic. As a result, the District Court found that for those women who have the fewest financial resources, those who must travel long distances, and those who have difficulty explaining their whereabouts to husbands, employers, or others, the 24-hour waiting period will be "particularly burdensome."
>
> These findings are troubling in some respects, but they do not demonstrate that the waiting period constitutes an undue burden.

*Id.* at 885-86 (quotation marks and citations omitted).

Casey thus makes clear that the substantial obstacle test is, as the name suggests,

substantial. It requires more than State-sponsored informed consent and State-sponsored advocacy for childbirth. It requires more than delay and inconvenience. Indeed, even when the restriction in question is "particularly burdensome" for women with few financial resources, women who must travel long distances, and women who may have difficulty explaining their whereabouts to husbands, employers, or others, the Supreme Court held that the burden does not rise to the level of a substantial obstacle that invalidates the statute.[5]

Perhaps because of the substantial nature of the *Casey* test, every federal court that has considered a 24-hour informed consent requirement since *Casey* has upheld the requirement. *See Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361(6th Cir. 2006); *A Woman's Choice-East Side Women's Clinic v. Newman*, 305 F.3d 684 (7th Cir. 2002); *Eubanks v. Schmidt*, 126 F. Supp. 2d 451 (W.D. Ky. 2000); *Karlin v. Foust*, 188 F.3d 446 (7th Cir. 1999); *Utah Women's Clinic v. Leavitt*, 844 F. Supp. 1482 (D. Utah 1994), *rev'd in part and dismissing appeal in part*, 75 F.3d 564 (10th Cir. 1995); *Planned Parenthood, Sioux Falls Clinic v. Miller*, 860 F. Supp. 1409 (D.S.D. 1994); *Fargo Women's Health Org. v. Schafer*, 18 F.3d 526 (8th Cir. 1994); *Barnes v. Moore*, 970 F.2d 12 (5th Cir. 1992).

Plaintiffs note, however, that *Casey* was based on the factual record before the Supreme Court. *See* 505 U.S. at 887 ("[O]n the record before us, and in the context of this facial challenge, we are not convinced that the 24-hour waiting period constitutes an undue burden."); *see also Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 541 (9th Cir. 2004) ("*Casey* made clear that the 'substantial obstacle' standard for determining when a law poses an undue burden on the right to obtain an abortion is record-dependent."). Plaintiffs assert

---

[5] The parties disagree on the proper definition of "substantial obstacle" under *Casey*. Defendants assert that a substantial obstacle exists only when the statute is "likely to prevent" a woman from obtaining an abortion, or when the woman is "likely to be deterred." *Casey*, 505 U.S. at 893-94; *see also Karlin v. Foust*, 188 F.3d 446, 482 (7th Cir. 1999) ("[T]o constitute an undue burden, a challenged state regulation must have a strong likelihood of *preventing* women from obtaining abortions rather than merely making abortions more difficult to obtain." (emphasis in original)). Plaintiffs contend that something less than the prevention or deterrence may constitute a substantial obstacle. The Court need not resolve this issue now. The Court concludes that Plaintiffs have failed to show a likelihood of success on the undue burden test even if prevention and deterrence are not required.

1  that the evidence presented with their motion establishes an undue burden that was not

2  revealed by the record in *Casey*, and that the result in *Casey* therefore does not control the

3  result in this case. The Court agrees that *Casey* left the door open for a fact-specific showing

4  that a 24-hour provision imposes an undue burden. The question to be decided on this

5  motion, then, is whether Plaintiffs have shown that they are likely to establish at trial that

6  Arizona's 24-hour provision imposes an undue burden.

7  Plaintiffs identify four categories of women for whom they contend the 24-hour

8  provision presents a substantial obstacle: those for whom it would (1) make an abortion

9  impossible, (2) impose a delay of one week or more and thereby increase the health risks of

10  the abortion, (3) force disclosure of the abortion to a person from whom the woman

11  otherwise would keep the abortion secret, and (4) cause significant physical or psychological

12  harm. Dkt. #6 at 26-27. Plaintiffs' 92 declarations were obtained from abortion patients at

13  Tucson Women's Center and Family Planning Associates between August 25 and September

14  4, 2009. Dkt. #7-1. Each declaration is in the form of a questionnaire that asks questions

15  regarding the patient's pregnancy, personal circumstances, and abortion.[6] Plaintiffs also

16  provide declarations from two doctors who regularly perform abortions (Dkt. ##5-1, 5-2, 56-

17  2, 56-3), two clinical psychologists who specialize in violence against women, rape, and

18  incest (Dkt. ##5-4, 5-5), and a Ph.D. abortion expert (Dkt. #5-6). The Court will address the

19  effect of this evidence with respect to the four categories of women identified by Plaintiffs.[7]

20  **1.    Women for Whom Abortions Would Become Impossible.**

21  Of the 92 women who provided declarations, 14 state that the 24-hour provision

22

23  [6] *Amicus curiae* attack the reliability of the declarations, noting that they are signed
with pseudonyms and appear to be in the handwriting of only a few people. Dkt. #52 at 5.
24  Plaintiffs respond with a declaration of attorney Rebecca Hart explaining how she assisted
in collecting some of the declarations. Dkt. #56-1. Because the Court concludes that
25  Plaintiffs' motion should be denied even if all of the declarations are considered, it will not
address the admissibility of the declarations at this time.
26

27  [7] In discussing whether Plaintiffs are likely to satisfy the substantial obstacle test, the
28  Court does not intend to identify firm categories of "substantial obstacles" for trial. The final
definition and assessment of substantial obstacles are best left to a more complete record.

would have made their abortions impossible. Dkt. #7-1. The Court has examined the declarations individually and finds that six of these 14 women – Tiffany Collins, Carly Doe, Sara Gilmore, Amber Jones, Amanda Perez, and Stacy Smith – provide reasonably concrete and credible reasons for their assertions that an abortion would have been impossible under the 24-hour provision. These include a combination of loss of jobs or school; a substantial inability to arrange child care, accommodations, or travel; fear of retaliation; and, significantly, the advanced stages of their pregnancies, which leave little or no time for an abortion if delay occurs. Dkt. #7-1 at 29-31, 45-47, 73-75, 105-07, 204-06, 364-66.[8]

The other eight declarations also state that the abortions would have been impossible, but the reasons they provide are less concrete and credible. Some assert that child care, work, and transportation issues would have made a second trip impossible, but their abortions occurred relatively early in their pregnancies and they live relatively close to the clinic. *Id.* at 49-51, 133-35, 153-55, 224-26, 244-46, 264-66, 308-10. Two state that the emotional toll would have been too great, but provide no explanation. *Id.* at 190, 309. Another states that she wanted to keep the abortion secret from her parents, but she too obtained her abortion early and does not explain why a 24-hour delay would have resulted in her parents learning of the procedure, particularly when her boyfriend drove her to the clinic. *Id.* at 226.

The Court's task in ruling on Plaintiffs' preliminary injunction motion is to determine a future likelihood – whether Plaintiffs are likely to succeed in establishing the merits of their claim at trial. Given the lack of concrete explanations in these eight declarations, the Court cannot conclude that Plaintiffs are likely to succeed in showing that abortions would have been impossible for these eight women. Under *Casey*, Plaintiffs must show more than that the 24-hour provision is "particularly burdensome." 505 U.S. at 885-86. The Court therefore concludes that Plaintiffs are likely to succeed in showing that the 24-hour provision would have made abortions impossible for six women, but the Court cannot reach the same

---

[8] The Court understands that the names of these women are pseudonyms, and therefore perceives no risk to the women by identifying them in this order. The Court notes that the women are identified by these names in declarations placed in the public record by Plaintiffs. Dkt. #7-1.

conclusion with respect to the eight women who fail to provide concrete reasons for their assertions. Plaintiffs do not claim that any other women in this first category satisfy the substantial obstacle requirement.[9]

### 2. Women for Whom Delay Would Result in Increased Health Risks.

Plaintiffs note that 45 of the women who completed declarations state that the 24-hour provision would have caused them to delay their abortions for at least one week. Dkt. ##6 at 28, 56 at 14.[10] Plaintiffs assert that this delay will expose the women to significantly greater health risks. Plaintiffs assert that the risk of death from abortion increases 38% for each week the abortion is delayed beyond eight weeks. Dkt. #6 at 10. For two reasons, the Court concludes that Plaintiffs have not shown they are likely to succeed in establishing an undue burden based on such health risks.

First, the 24-hour waiting period does not apply "in the case of a medical emergency." A.R.S. § 36-2153(A). "'Medical emergency' means a condition that, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major

---

[9] The Court does not mean to minimize the concerns of the women who completed declarations or the challenges they face. Nor in later sections of this order is the Court insensitive to the health risks faced by some women obtaining abortions. But Plaintiffs mount a broad attack on the statute and ask the Court to enjoin it state-wide. Plaintiffs do not base their claim on the specific circumstance of any particular woman, but instead ask the Court to conclude that the Act will impose an undue burden on a large fraction of the women to whom it applies. Dkt. ##6, 56. Plaintiffs count numbers, asserting that 63% of the relevant group will encounter a substantial obstacle. Dkt.#6 at 22-23. Because Plaintiffs have chosen to attack the 24-hour provision generally, the Court must consider the evidence generally, asking whether it shows an undue burden on a large fraction of the relevant group. The inquiry necessarily considers numbers, but the Court is mindful that real lives underlie the data.

[10] Plaintiffs' motion states that 45 of patients averred the 24-hour provision would cause them to wait one week. Dkt. #6 at 14-15. Elsewhere in that motion, Plaintiffs say 41 women made the assertion. *Id.* at 28. Plaintiffs' reply also says 41. Dkt. #56 at 14. The Court counts 45 patients who made the assertion.

1 bodily function." A.R.S. § 36-2151(5).

2 The Pennsylvania statute at issue in *Casey* contained an identical medical emergency

3 provision. *See* 505 U.S. at 879. At least 25 other states have adopted essentially the same

4 definition. *See Wasden*, 376 F.3d at 926. In *Casey*, the court of appeals construed the

5 Pennsylvania provision to mean that compliance with the 24-hour waiting period "would not

6 in any way pose a significant threat to the life or health of a woman." 505 U.S. at 880

7 (quotation omitted). The Supreme Court deferred to this construction by the lower court and

8 held that the emergency provision, so construed, eliminated any undue burden that might

9 otherwise have been imposed by the statutory delay: "In light of the construction given the

10 statute's definition of medical emergency by the Court of Appeals, and the District Court's

11 findings, we cannot say that the waiting period imposes a real health risk." *Id.* at 886.

12 This Court reaches the same conclusion. The Arizona statute provides that the 24-

13 hour provision does not apply if, in the physician's good faith judgment, an immediate

14 abortion is required by the woman's medical condition in order to avoid death, or when delay

15 will create a serious risk of substantial and irreversible impairment of a major bodily

16 function.

17 Plaintiffs argue that the medical emergency exception is too narrow – that it protects

18 women only from death or serious risks of permanent impairment to major bodily functions.

19 Plaintiffs contend that some women whose abortions are delayed by the 24-hour provision

20 will face serious health risks that do not fall within this definition, and that those women will

21 face a substantial obstacle not alleviated by the medical emergency exception. But Plaintiffs

22 provide no statistics concerning the number of women in this category. Plaintiffs thus

23 provide no basis for the Court to conclude that a large fraction of the relevant group will

24 experience increased health risks.

25 Plaintiffs cite to the declarations of Drs. Richardson, Isaacson, and Henshaw, but these

26 declarations state only that the 24-hour delay will increase the risk of health problems for

27 some patients. They do not assert that the problems will fall outside the statutory definition

28 of medical emergency, nor do they describe the nature, severity, or statistical frequency of

1   the conditions to which they are referring. *See* Dkt. ##5-1, ¶ 16; 5-2, ¶ 19; 5-6, ¶¶ 5-6. Dr.

2   Henshaw does assert that each week's delay beyond eight weeks of pregnancy will increase

3   the risk of death by 38% – a statistic that will be discussed below – but he does not address

4   which cases would fall outside the medical emergency exception so as to create this risk.

5        Plaintiffs attach new declarations from Drs. Richardson and Isaacson to their reply

6   memoranda. Dkt. #56-2, 56-3. The Court normally does not consider evidence submitted

7   for the first time with a reply because the other side has not had a fair opportunity to respond.

8   In this case, however, Defendants had an opportunity to address the supplemental

9   declarations at oral argument. Both doctors note that they often perform abortions for

10  women referred by other doctors because of particular health issues. Both doctors typically

11  try to complete the procedure on the day of the referral or the next day, often coordinating

12  the procedure with the availability of the referring physician. Dr. Richardson asserts that it

13  is difficult to say "with certainty," and Dr. Isaacson says it is difficult to "be certain," that the

14  risk posed by delaying these abortions would cause a "serious risk of substantial and

15  irreversible impairment of a major bodily function" as required by the medical emergency

16  exception in the statute. Dkt. ##56-2 at 4, 56-3 at 2-3. Plaintiffs rely on these declarations

17  to assert that the exception does not alleviate the health risks confronting abortion patients.

18       The Court first notes, however, that the medical emergency exception does not require

19  certainty as the doctors suggest. It calls only for a physician's "good faith clinical

20  judgment." A.R.S. § 36-2151(5). More importantly for purposes of this motion, Drs.

21  Richardson and Isaacson provide no information about the frequency of these cases or the

22  number of abortions in which they arise. Plaintiffs therefore fail to show that health issues

23  not covered by the medical emergency exception will arise in a "large fraction" of the

24  relevant group.[11]

25

26      [11] When the Court questioned Plaintiffs' counsel about this gap in the evidence during

27  oral argument, counsel said that the doctors were in the courtroom and could provide
    additional information. But she made no proffer of what they would say and did not request

28  to call them as witnesses. Moreover, presenting live testimony on such an issue at oral
    argument and only hours before the statute is to become effective would not have afforded

1    Second, even if the medical emergency exception is disregarded, the evidence
2    submitted by Plaintiffs does not show that the 24-hour provision will create a substantial
3    obstacle for a large fraction of the relevant group. The parties disagree on the level of health
4    risk required to reach a substantial obstacle. But surely not every increase in risk would
5    suffice. Inconsequential increases could not be characterized as substantial obstacles to an
6    abortion. *Casey* did not identify the level of health risk that will constitute a substantial
7    obstacle, but did make reference to an "appreciable health risk" and a "real health risk." 505
8    U.S. at 885, 886. Other cases also speak of "appreciable" health risks. *See, e.g., Richmond*
9    *Med. Ctr. for Women v. Gilmore*, 11 F. Supp. 2d 795, 827 (E.D. Va. 1998); *Carhart v.*
10    *Stenberg*, 972 F. Supp. 507, 524-525 (D. Neb. 1997). The Court need not attempt to
11    determine the precise level of risk required for a substantial obstacle, however, because
12    Plaintiffs have not shown a real or appreciable health risk under any reasonable definition.

13    Of the 92 women who provided declarations, 45 indicate that the 24-hour provision
14    would have delayed their abortion by at least one week. Dkt. #7-1. Plaintiffs assert that each
15    week of delay after eight weeks of pregnancy increases the risk of death by 38%. Dkt. #6
16    at 10. They do not specify the increase that occurs before eight weeks. From this evidence,
17    and general assertions by the doctors that delays increase the risk of abortion procedures,
18    Plaintiffs contend that the delay caused by the 24-hour provision will significantly increase
19    health risks of the 45 women who provided declarations.

20    The Court cannot agree. Plaintiffs cite a 38% increase in risk, but 38% of a very small
21    number is still a very small number. Plaintiffs' own expert, Dr. Henshaw, avers that
22    "[a]bortion *at any stage* is considered to be one of the safest surgical procedures." Dkt. #5-6,
23    ¶ 5 (emphasis added). Plaintiffs' physician experts likewise aver that "abortion is a very safe

24

25  the State a fair opportunity to respond. With respect to the definition of medical emergency,
26  the court of appeals in *Casey* construed an identical medical emergency provision to mean
that the 24-hour waiting period "would not in any way pose a significant threat to the life or
27  health of a woman." 505 U.S. at 880 (quotation omitted). The Court need not decide at this
time whether the Arizona exception should be construed in the same way. Even in the
28  absence of such a construction, Plaintiff's have not shown that the 24-hour provision creates
a risk of serious medical complications for a large fraction of the relevant group.

procedure and the risk of complication from abortion is very low[.]" Dkt. #5-1, ¶ 16; #5-2, ¶ 19; *see also* L. Bartlett et al., *Risk Factors for Legal Induced Abortion-Related Mortality in the United States*, 103 J. Obstetrics & Gynecology 729 (2004), *available at* http://www. acog.org/from_home/publications/green_journal/2004/v103n4p729.pdf.

The risk of death from an abortion performed at eight weeks or earlier is 0.1 per 100,000, or one in 1,000,000. *Id.* at 733, Tbl. 2.  Given this very low risk, the Court cannot conclude that delays in abortions before eight weeks would constitute a real or appreciable health risk.  The risk does increase after eight weeks, but it still appears to be small. *Id.* At nine to ten weeks the risk is 0.2 per 100,000; at eleven to twelve weeks it is 0.4 per 100,000; at thirteen to fifteen weeks it is 1.7 per 100,000; at sixteen to twenty weeks it is 3.4 per 100,000; and at twenty-one weeks or more it is 8.9 per 100,000. *Id.*

With the exception of childbirth, Plaintiffs provide no information from which the Court can assess the seriousness of these risks as compared to other medical procedures or daily activities that people routinely accept.  Dr. Henshaw does note that the risk of death in childbirth is 12.4 times higher than the risk of death in abortions.  Dkt. #5-6, ¶ 5.  Taking Dr. Henshaw at his word – that abortion "at any stage" is considered one of the safest surgical procedures (*id.*) – the Court cannot conclude that one-week increases in abortion risks represent such real or appreciable health risks as to constitute a substantial obstacle to an abortion.  The Court likely will have a greater ability to evaluate the increased risks at trial, particularly if the parties provide comparative risks for other routinely accepted medical procedures, but on this record Plaintiffs have not shown that they are likely to succeed in proving that a one-week delay will constitute a substantial obstacle to abortion.[12]

---

[12] Among the 45 women who state that the 24-hour provision would have delayed their abortions, most say it would have delayed the abortion one week.  Dkt. #7-1.  This generally comports with a study cited by Dr. Henshaw which shows that 24-hour waiting periods cause delays of 4.7 days for low-income women who live in counties with no abortion providers.  Dkt. #5-6, ¶¶ 12, 13.  Thus, it appears that the delays caused by the 24-hour provision will usually be about one week.  The increase in risk caused by the provision, therefore, will be the difference between the risk when the woman elected to schedule her abortion and the risk one week later.

1

### 3.    The Risk of Unwanted Disclosures.

Plaintiffs note that 14 of the women submitting declarations state that the 24-hour provision would prevent them from keeping their abortions confidential from family members, friends, or coworkers. Dkt. #6 at 15. These women, however, provide no details concerning the consequences of such disclosure. Dkt. #7-1 at 16, 63, 75, 119, 191, 226, 262, 274, 286, 290, 310, 334, 358, 374. Six other women, not mentioned by Plaintiffs in this category, say they were keeping their abortions secret from someone whom they feared would pose a danger to them. *Id.* at 4, 12, 55, 131, 187, 206.

Responding to the 14 women identified by Plaintiffs, Defendants contend that courts have viewed the likely disclosure of an abortion to be a substantial obstacle only when women are in abusive relationships or the disclosure would be to the government in a public-records format. Dkt. #51 at 14-15. Plaintiffs disagree, citing cases where concerns about disclosures have been recognized. Dkt. #56 at 13.[13]

Rather than attempting to resolve this disagreement now, the Court will credit the declarations of all six women who fear danger if their abortions are revealed. Because one of them – Amanda Perez – was counted in Plaintiffs' first category, the Court will not count her again for purposes of the "large fraction" determination. Dkt. #7-1 at 204-06. For purposes of this motion, however, the Court will assume that Plaintiffs are likely to succeed in establishing that the other five women face a substantial obstacle.

The Court cannot reach the same conclusion with respect to the 14 women who fail to provide any detail as to the consequences of unwanted disclosures. The Court cannot conclude, for example, that disclosures to coworkers or some family members would always rise to the level of a substantial obstacle to abortion. The district court in *Casey* found that the 24-hour waiting period would create difficulty for women required to explain "their whereabouts to husbands, employers, or others," and even characterized this difficulty as "particularly burdensome." 505 U.S. at 886. *Casey* held, however, that these difficulties "do

27

28
[13] Plaintiffs cite *Casey*'s reference to disclosures "to family and friends," but this reference appears in the context of abusive relationships. *See* 505 U.S. at 893.

1   not demonstrate that the waiting period constitutes an undue burden." *Id.* On the record
2   provided by Plaintiffs, the Court cannot conclude that the 14 women will face substantial
3   obstacles sufficient to create the undue burden necessary to invalidate the law.

4             **4.    Increased Physical or Psychological Harm.**

5        Plaintiffs describe this category as women who have been victims of rape or incest.
6   Plaintiffs contend that these women will be traumatized by the statute's required disclosures
7   and the added waiting time, but they do not identify the number of women in their group of
8   92 who will be so affected. Dkt. #6 at 16-17. Plaintiffs' declarations of abortion patients did
9   not make the inquiry. Dkt. #7-1. Plaintiffs thus provide no evidence from which the Court
10  can determine what portion of the relevant group would face this problem.

11            **5.    Conclusion.**

12       Plaintiffs have shown that they are likely to succeed in establishing that 11 women –
13  six from their first category and five from their third – will face a substantial obstacle from
14  the 24-hour provision. The Court cannot say that 11 out of 92 constitutes a "large fraction"
15  of the relevant group. This would be true even if the Court adopted Plaintiffs' relevant group
16  of 80. Under the analysis mandated by *Casey*, therefore, Plaintiffs have failed to show that
17  they are likely to succeed in their claim that the 24-hour provision imposes an undue burden
18  on the right of Arizona women to an abortion.[14]

19  _____

20       [14] At oral argument, Plaintiffs asserted that *Casey*'s "large fraction" test is conceptual,
21  not mathematical. They argued that a large fraction can exist in a qualitative sense even if
22  the numerical fraction is relatively small. Thus, they would contend, even 11 women out of
    92 constitute a large fraction given the level of difficulties faced by the 11 women under the
23  Arizona statute. The Court cannot agree. *Casey*, in a very carefully worded opinion, chose
    the phrase "large fraction" to describe the extent of the substantial obstacles that must exist
24  before a statute can be said to impose an undue burden on the right to an abortion. The
25  choice was clearly deliberate. The "large fraction" requirement was discussed at some length
    in other *Casey* opinions. *See* 505 U.S. at 925, 926, 938 n. 9, 942 (Blackmun, J., concurring),
26  965, 973 n. 2, (Rehnquist, C.J., concurring in part and dissenting in part). The Court cannot
    conclude that the use of the rather mathematical phrase was inadvertent or imprecise. Had
27  *Casey* intended to establish a test that looked at the severity of the hardship suffered by
28  women under the statute rather than the number of women who would encounter a
    substantial obstacle, it could have imposed a "significant hardship" test or similar words. It

1   Because Plaintiffs have failed to satisfy the first requirement for a preliminary

2   injunction, the Court need not address the remaining requirements. *See Freecycle Network,*

3   *Inc. v. Oey*, 505 F.3d 898, 906 n.15 (9th Cir. 2007).  The Court will deny Plaintiffs' request

4   for a preliminary injunction on the 24-hour provision.

5   **IV.   Payment Provision.**

6   The payment provision states that a person shall not "require or obtain payment for

7   a service provided to a patient who has inquired about an abortion or scheduled an abortion

8   until the expiration of the twenty-four hour reflection period required by subsection A [of

9   section 36-2153]." A.R.S. § 36-2153(D). A physician who knowingly violates this provision

10   "commits an act of unprofessional conduct and is subject to license suspension or

11   revocation[.]" A.R.S. § 36-2153(F).

12   Plaintiffs' vagueness argument focuses on the words "has inquired about." Plaintiffs

13   concede that the payment provision is clear as it applies to abortion doctors.  The patients of

14   such doctors must be afforded the informed consent and 24-hour waiting period prescribed

15   by subsection (A), and the payment provision makes clear that such doctors may charge for

16   their services only after the waiting period has expired. Dkt. #6 at 29. Plaintiffs contend that

17   the provision is unconstitutionally vague, however, when it comes to doctors who do not

18   perform abortions.  Such doctors may well have patients who "inquire[] about an abortion"

19   within the meaning of the statute, but who take no steps to obtain one.  Once triggered by

20   such an inquiry, Plaintiffs contend, the payment provision would prohibit such physicians

21   from charging for their services even if the patients never seek an abortion.  Plaintiffs assert

22   that the payment provision gives no guidance to physicians in this position, forcing them to

23   guess at when or how they can charge for non-abortion services without risking suspension

24   or revocation of their licenses. *Id.*; *see* Dkt. #56 at 21 n.20.  Plaintiffs also argue that such

25   _____

26   did not.  In fact, *Casey* rejected the district court's "particularly burdensome" finding as a
    sufficient basis for constitutional invalidity.  The Court concludes that "large fraction" must
27   be taken at face value.  Courts must consider the proportion of women in the relevant group
    who will encounter a substantial obstacle, and should strike down statutes as unconstitutional
28   only if a large fraction of the women in the group face such an obstacle.

1   a vague provision lends itself to arbitrary enforcement. Dkt. #6 at 29.

2          Defendants say the purpose of the payment provision is to prevent abortion providers

3   from creating a financial incentive for a woman to have an abortion by requiring her to pay

4   for the procedure before the 24-hour waiting period. Dkt. #51 at 23. Plaintiffs' concerns

5   about non-abortion doctors are unwarranted, Defendants argue, because the provision applies

6   only when a patient must be provided informed consent under subsection (A), and that occurs

7   only when the patient seeks an abortion. Dkt. #51 at 22. The payment restriction does not

8   apply to patients who merely inquire about an abortion because those patients need not give

9   the informed consent under subsection (A). *Id.* at 22-23.

10         The proposed intervenors make a similar argument. They assert that the 24-hour

11  reflection period is triggered under subsection (A) only when an abortion is to be "performed

12  or induced," and thus healthcare professionals who do not intend to perform or induce an

13  abortion have no reason to be concerned about liability under the payment provision.

14  Dkt. #52 at 10. They further assert that the other provision of subsection (D) prohibiting a

15  person from prescribing a drug to induce an abortion until the reflection period has expired

16  makes clear that the payment provision is directed at abortion providers, not other doctors.

17  *Id.*

18       **A.**    **The Vagueness Doctrine.**

19         "The Fourteenth Amendment is violated by laws so vague that persons 'of common

20  intelligence must necessarily guess at their meaning and differ as to their application.'"

21  *Tucson Woman's Clinic*, 379 F.3d at 554 (quoting *Planned Parenthood v. Arizona*, 718 F.2d

22  938, 947 (9th Cir. 1983)). "A law is unconstitutionally vague if it fails to provide a

23  reasonable opportunity to know what conduct is prohibited, or is so indefinite as to allow

24  arbitrary and discriminatory enforcement." *Id.* (internal citations omitted). Courts also

25  recognize, however, that "[s]tatutes need not be written with 'mathematical' precision, nor

26  can they be thus written." *Forbes v. Napolitano*, 236 F.3d 1009, 1011 (9th Cir. 2000)

27  (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)).

28

1    **B.   Arizona Law and the Meaning of the Payment Provision.**

2    The Court's role is to interpret the provision as would the Arizona Supreme Court.

3    *See Wasden*, 376 F.3d at 925.  Under Arizona law, a court's primary goal in interpreting a

4    statute is "'to fulfill the intent of the legislature that wrote it.'" *Bilke v. Arizona*, 80 P.3d 269,

5    271 (Ariz. 2003) (en banc) (quoting *State v. Williams*, 854 P.2d 131, 133 (Ariz. 1993)).  The

6    court must seek "to give effect to the entire statutory scheme." *Backus v. State*, 203 P.3d

7    499, 502 (Ariz. 2009) (en banc); *see Zamora v. Reinstein*, 915 P.2d 1227, 1230 (Ariz. 1996)

8    (en banc) (stating that statutes should be interpreted "'to achieve the general legislative goals

9    that can be adduced from the body of legislation in question'") (citation omitted).  Courts

10   interpreting Arizona statutes must apply "'fundamental principles of statutory construction,

11   the cornerstone of which is the rule that the best and most reliable index of a statute's

12   meaning is its language and, when language is clear and unequivocal, it is determinative of

13   the statute's construction.'" *Deer Valley Unified Sch. Dist. No. 97 v. Houser*, 152 P.3d 490,

14   493 (Ariz. 2007) (en banc) (quoting *Janson ex rel. Janson v. Christensen*, 808 P.2d 1222,

15   1223 (Ariz. 1991)).

16   The Court finds the payment provision to be ambiguous.  Defendants assert that the

17   provision would not apply if a patient requests general information about abortion, but the

18   language of the statute appears to prohibit pre-waiting-period collection of fees from any

19   "patient who has inquired about an abortion[.]"  A.R.S. § 36-2153(D).  Such inquiries may

20   well arise outside the abortion context.  Patients may ask their doctors about abortions

21   without ever intending to obtain one.  Doctors who never perform abortions, such as those

22   practicing obstetrics and gynecology, might well be asked about abortions by their patients.

23   Dr. Laudonia confirms that this occurs in his practice.  Dkt. #5-3, ¶ 7.  The statute could be

24   read to suggest that such inquiries trigger the payment provision and prohibit the doctors

25   from billing for their services until the 24-hour provision has been satisfied – something that

26   will never occur in many of these inquiries.

27   The fact that a statute is ambiguous, however, does not mean that it is invalid.

28   Arizona courts seek to "determine legislative intent by reading the statute as a whole, giving

1  meaningful operation to all of its provisions, and by considering factors such as the statute's

2  context, subject matter, historical background, effects and consequences, and spirit and

3  purpose." *Zamora*, 915 P.2d at 1230; *see Ariz. Newspapers Ass'n, Inc. v. Super. Ct.*, 694

4  P.2d 1174, 1176 (Ariz. 1985) (en banc). Applying these principles, the Court concludes that

5  Defendants' interpretation of the statute is probably correct.

6       The Act regulates abortion and nothing more. Section 36-2152 deals with parental

7  notification and judicial bypass requirements for minors seeking abortions. Section 36-2153

8  includes the 24-hour provision and established civil remedies for women who have received

9  an abortion and for fathers and maternal grandparents of the aborted fetus. Section 36-2154

10  concerns the right of healthcare professionals to refuse to participate in abortions. Section

11  36-2151 defines terms used in these other sections. "[R]eading the statute as a whole, giving

12  meaningful operation to all of its provisions," and giving effect to its context, subject matter,

13  consequences, and purpose, *Zamora*, 915 P.2d at 1230, the Court concludes that the Arizona

14  legislature sought to regulate abortions. No other kind of health care is regulated.[15]

15       The payment provision also appears to focus on abortion. The first part of the

16  provision concerns persons who "write or communicate a prescription for a drug or drugs to

17  induce an abortion[.]" A.R.S. § 36-2153(D). The last part concerns "services provided to

18  a patient who has . . . scheduled an abortion[.]" *Id.* Only the middle phrase, concerning

19  patients who have "inquired about an abortion," is not firmly tied to the act of providing

20  abortions. *Id.* The context of the ambiguous language thus suggests that it is concerned with

21  abortions, not with other health services that may occasionally involve inquiries about

22  abortions.

23       Given the singular focus of the statute and the context of the ambiguous phrase, the

---

25      [15] The sparse legislative history confirms this focus. The Arizona House of
26  Representatives' summary explains that "HB 2564 makes a variety of changes to statutes related to abortion[.]" *See* http://www.azleg.gov/DocumentsForBill.asp?Bill Number=
27  HB2564 (follow "Show Summaries/Fact Sheets" link). Hearing minutes from the House Committee on Health and Human Services also demonstrate that the focus of the
28  Act was abortion. *See* http://www.azleg.gov/CommitteeInfo.asp?Committee_ID=23 (follow "Minutes Document" link for 2/25/09).

Court concludes that the payment provision was intended to regulate only abortion providers. Nothing in the Act suggests that other health care services were targeted. The Court concludes that the payment provision most reasonably can be read as applying only in those consultations and services attached to the performing or inducing of abortions. Inquiries outside of this context, such as inquiries made to a doctor practicing obstetrics and gynecology, are not covered by the provision. So construed, the payment provision is not unconstitutionally vague.

This interpretation squares with another important principle of Arizona law – that courts should construe statutes "to avoid rendering them unconstitutional." *Hayes v. Cont'l Ins. Co.*, 872 P.2d 668, 676-77 (Ariz. 1994); *see Zamora*, 915 P.2d at 1232 ("We will not 'declare invalid for vagueness every statute which we believe could have been drafted with greater precision.'") (quoting *State v. Tosco*, 750 P.2d 874, 877-78 (Ariz. 1988)); *State Bd. of Tech. Registration v. McDaniel*, 326 P.2d 348, 357 (Ariz. 1958) (an "Act will be given a construction consistent with validity if at all possible") (citation omitted); *Adams v. Bolin*, 247 P.2d 617, 626 (Ariz. 1952) ("all presumptions and intendments are in favor of the validity and constitutionality of legislative acts"); *see also Gonz*ales *v. Carhart*, 550 U.S. 124, 153 (2007) ("[T]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.") (quotations omitted); *Wasden*, 376 F.3d at 925 (courts must "presume the legislature both intended to and did in fact act constitutionally" and must "indulge in any reasonable construction that can save the statute from invalidity").

## C.    Certification to the Arizona Supreme Court and Denial of Motion.

The Court recognizes that the construction of Arizona statutes is a matter for Arizona state courts to decide, that Arizona law generally requires a construing court to "give effect to each word of the statute," *Bilke*, 80 P.3d at 271, and that the construction of section 36-2153(D) adopted in this order could be viewed as rendering the words "inquired about" superfluous. The Court therefore will certify the proper interpretation of the payment provision to the Arizona Supreme Court. *See* A.R.S. § 12-1861; Ariz. Sup. Ct. R. 27. In the

meantime, because the Court finds a constitutional reading of the statute to be most reasonable, the Court concludes that Plaintiffs have not shown they are likely to prevail on the merits of this claim. Plaintiffs' motion for a preliminary injunction on the payment provision will therefore be denied. The Court need not address the additional requirements for a preliminary injunction. *See Freecycle Network*, 505 F.3d at 906 n.15.

**IT IS ORDERED:**

1. Plaintiffs' motion for preliminary injunction and expedited briefing schedule (Dkt. #5) is **granted** with respect to the expedited briefing schedule, but **denied** with respect to the preliminary injunction.

2. By separate order, the Court will certify the following question to the Arizona Supreme Court: Whether the payment provision of A.R.S. § 36-2153(D) applies only when the informed consent and 24-hour waiting period of A.R.S. § 36-2153(A) is triggered by the actual providing or inducing of an abortion, or whether it applies outside the abortion context whenever an inquiry about abortion is made to a health care provider.

3. The motions for leave to file excess pages (Dkt. ##53, 57) are **granted**.

4. The Court will set a Rule 16 scheduling conference after it has ruled on the pending motion to intervene.

DATED this 29th day of September, 2009.

David G. Campbell
United States District Judge